# IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | **:** | |
| **v.** | **:** | **CRIMINAL NOS.** **17-CR-0563** |
| | | **19-CR-0462** |
| **DONALD "D.A." JONES** | **:** | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by its undersigned attorneys, hereby submits this

sentencing memorandum.  Defendant Donald "D.A." Jones trampled over the nation's campaign

finance laws when he committed criminal offenses in the Eastern District of Pennsylvania and

further corrupted the political process in the Western District of Missouri by participating in a

series of deceptions and fraud.  For the reason stated below, the government respectfully

recommends a period of incarceration.

## I.    LEGAL BACKGROUND

On October 24, 2017, a federal grand jury sitting in the Eastern District of Pennsylvania

returned an indictment charging Donald "D.A." Jones with violating federal campaign finance

laws in connection with a 2012 congressional primary campaign for the United States House of

Representatives.

On December 4, 2017, defendant Jones executed a written plea agreement with the

United States Attorney's Office for the Eastern District of Pennsylvania (EDPA) in *United States

v Donald "D.A." Jones*, 17-00563-JD.  In his plea agreement, the parties expressly contemplated

that another matter from the Western District of Missouri would be transferred to the Eastern

District of Pennsylvania for sentencing pursuant to Rule 20 of the Federal Rules of Criminal

Procedure.

On December 8, 2017, defendant Jones entered a plea of guilty to Count Six of the indictment charging him with making false statements in violation of 18 U.S.C. § 1001(a)(2). *See United States v Donald "D.A." Jones*, 17-00563-JD, Dkt. No. 25.

On December 18, 2017, defendant Jones executed a written plea agreement with the United States Attorney's Office for the Western District of Missouri (WDMO). In his plea agreement with WDMO, the parties expressly contemplated that Jones' matter from the United States District Court in the Western District of Missouri would be transferred to the Eastern District of Pennsylvania for sentencing pursuant to Rule 20 of the Federal Rules of Criminal Procedure.

That same day, an information was filed in the United States District Court for the Western District of Missouri charging defendant Jones with conspiracy against the United States in violation of 18 U.S.C. § 371, that is, conspiracy to steal from an organization receiving federal funds. Defendant subsequently entered a plea of guilty to the information.

Timothy Garrison, United States Attorney for the WDMO, and William M. McSwain, United States Attorney for the EDPA, have both consented in writing to the transfer of this matter from the WDMO to the EDPA for sentencing. The Rule 20 Transfer was received in this district on or about August 12, 2019.

The Third Circuit has set forth a three-step process for sentencing by district courts following *United States v. Booker*, 543 U.S. 220 (2005):

> (1) Courts must continue to calculate a defendant's Guidelines sentence precisely as they would have before *Booker*.

> (2) In doing so, they must formally rule on the motions of both parties and state on the record whether they are granting a departure and how that departure affects the Guidelines calculation, and take into account our Circuit's pre-*Booker* case law, which continues to have advisory force.

(3) Finally, they are to exercise their discretion by considering the relevant § 3553(a) factors in setting the sentence they impose regardless whether it varies from the sentence calculated under the Guidelines.

*United States v. Gunter*, 462 F.3d 237, 247 (3d Cir. 2006) (quotation marks, brackets, and citations omitted) (citing *United States v. King*, 454 F.3d 187, 194, 196 (3d Cir. 2006)). In calculating the guideline range, this Court must make findings pertinent to the guideline calculation by applying the preponderance of the evidence standard, in the same fashion as was employed prior to the *Booker* decision. *United States v. Grier*, 475 F.3d 556 (3d Cir. 2007) (en banc).

At the third step of the sentencing process, the Court must consider the advisory guideline range along with all the pertinent considerations of sentencing outlined in 18 U.S.C. § 3553(a) in determining the final sentence. "The record must demonstrate the trial court gave meaningful consideration to the § 3553(a) factors. . . . [A] rote statement of the § 3553(a) factors should not suffice if at sentencing either the defendant or the prosecution properly raises 'a ground of recognized legal merit (provided it has a factual basis)' and the court fails to address it." *United States v. Cooper*, 437 F.3d 324, 329-30 (3d Cir. 2006) (citations omitted). *See also Rita v. United States*, 551 U.S. 338, 356 (2007) ("The sentencing judge should set forth enough to satisfy the appellate court that he has considered the parties' arguments and has a reasoned basis for exercising his own legal decision-making authority."); *United States v. Flores-Mejia*, -- F.3d --, 2014 WL 3450938, *2 (3d Cir. 2014) (en banc) ("Failure to give 'meaningful consideration' to any such argument renders a sentence procedurally unreasonable which, when appealed, generally requires a remand for resentencing.").

Here, the sentence imposed must, most importantly, promote respect for the law and deter others who would destroy confidence in the integrity of the electoral and political processes by

committing similar offenses in pursuit of elected office, political power, or financial gain. *See* 18 U.S.C. § 3553(a)(2).

## II.  FACTUAL BACKGROUND

### 17-CR-00479 (Group 1)

On October 12, 2017, defendant Jones pleaded guilty to Count Six of the Indictment charging him with false statements in a matter within the jurisdiction of the executive branch, in violation of 18 U.S.C. § 1001(a)(2) arising from his participation in a scheme involving payments from the Bob Brady for Congress campaign to the congressional campaign of Jimmie Moore that were made for the purpose of removing Moore as a candidate from the 2012 Democratic race for Pennsylvania's First Congressional District.[1]  During his plea colloquy, the defendant admitted to his participation in a criminal scheme in 2012 that circumvented federal campaign finance limits in an attempt to defeat transparency in the campaign finance process as administered by the Federal Election Commission ("FEC").

### Bob Brady for Congress Scheme

In the 2012 Democratic primary election for Pennsylvania's First Congressional District, Jimmie Moore, a former Philadelphia Municipal Court Judge, ran against the incumbent, Robert Brady.  As the evidence at trial proved, Moore struck a deal by which he agreed to withdraw from the race in exchange for funds from the Bob Brady for Congress campaign (the "Brady Campaign') to be used to pay off Moore's campaign debts.  Those debts included money that Jimmie Moore for Congress (the "Moore campaign") owed to several vendors, to Moore himself, and to Carolyn Cavaness, who was Moore's campaign manager.  Jones' political consulting company was used as a pass through to funnel the last payment from the Brady

---

[1] In defendant's plea agreement with the Eastern District of Pennsylvania, the government agreed not to oppose Jones' request for concurrent terms.

campaign to Moore's agent. During the investigation, Jones lied to the FBI about his role and knowledge of the scheme.

### The Marjorie 2014 Scheme

Jones also participated in another scheme concocted by Smukler involving additional campaign finance offenses in connection with a different campaign: the 2014 congressional primary campaign of Marjorie Margolies. Smukler funneled three unlawful contributions to the campaign—a $78,750 contribution largely funded by his brother and two contributions totaling $150,000 funded by his friend—through his political consulting companies. Smukler also made two straw contributions to the campaign using his own money—a $23,750 contribution through the candidate and a $2,600 contribution through Jones. Smukler also caused the Margolies campaign to make false statements to the Federal Election Commission to disguise these unlawful contributions: three false statements on campaign finance reports and a false statement in a letter to the FEC written by a lawyer for the campaign in response to a complaint filed by one of Margolies's opponents.

### 19-CR-0462 (Group 2)

On December 18, 2017, in the Western District of Missouri, defendant Jones pled guilty to an Information, charging him with conspiracy in violation of 18 U.S.C. § 371, that is, conspiracy to steal from an organization receiving federal funds. Jones also agreed to forfeit to the United States the property described in the Forfeiture Allegation of the Information.

In that case, Jones's firm, D.A. Jones & Associates, based in Philadelphia, provided political and advocacy services, including consulting, analysis, and public relations. Jones admitted that he was paid approximately $973,807 by Preferred Family Healthcare, Inc., formerly known as Alternative Opportunities, Inc. ("the Charity"), a non-profit charity in

Springfield, Missouri, for illegal lobbying and political activity on behalf of the Charity. Two co-conspirators received a total of $264,000 in kickbacks from Jones.

Executives at the Charity were involved in the offenses including Tom Goss, Bontiea Goss, and Marilyn Nolan – all residents of Springfield, Missouri. Co-conspirator Milton R. Cranford, a resident of Rogers, Ark., served as an executive for Charity operations in the state of Arkansas. Cranford also operated two lobbying firms. An Arkansas lobbyist and former state legislator named Eddie Cooper was also complicit. Cooper was also a board member and employee of the Charity.

The Charity and its subsidiaries provide a variety of services to individuals, including mental and behavioral health treatment and counseling, substance abuse treatment and counseling, employment assistance, aid to individuals with developmental disabilities, and medical services. The Charity received Medicaid reimbursements from the states of Missouri, Arkansas, Kansas and Oklahoma from 2011 to 2016, of which the federal portion totaled more than $255 million. The Charity also received more than $53 million from the federal government (the Departments of Health and Human Services, Labor, Agriculture, Housing and Urban Development, Veterans Affairs, and Justice) under programs involving grants, contracts, loans, guarantees, insurance and other forms of federal assistance from July 1, 2010, to June 30, 2016.

The conspirators, including Jones, engaged in multiple schemes to unlawfully use the Charity's funds to make political contributions and for excessive and unreported lobbying and political advocacy. In order to provide a veneer of legitimacy for the kickbacks paid to themselves and others, and to disguise the nature and source of the payments, conspirators caused the payments to be described in the records as business expenses, such as "consulting" and "training" services, and executed sham "consulting agreements."

The conspirators caused the charity to engage in political outreach that violated both law and public policy. For example, they employed lobbyists and advocates (including Jones) to influence elected and appointed public officials, which the Charity did not properly report to the IRS on its annual returns.  Also, the conspirators caused personal contributions to elected officials and their political campaigns to be reimbursed by the Charity. Such indirect contributions are prohibited by law just as if the payments had been made by the Charity directly.

Jones admitted that he worked from 2011 through January 2017 to provide advocacy services, including direct contact with legislators and government officials, in order to influence elected and appointed public officials regarding legislative issues that impacted the Charity. Jones also solicited the assistance of elected and appointed officials in steering grants and other sources of funding to the Charity.

The charity paid Jones a total of $973,807, with some payments routed through different business entities or lobbying firms. Although his services were falsely described as "consulting" services and the payments made to Jones as payments pursuant to a "consulting agreement," they actually were payments for Jones's advocacy services, including direct contact with elected and appointed public officials.

Jones admitted that he paid $219,000 in kickbacks to Cranford and that he made two payments totaling $45,000 to Cooper.  Both Cranford and Cooper worked for the Charity. Jones has admitted to willfully blinding himself to (in other words, deliberately avoided learning or recognizing) the following facts, which should have been obvious to him:

- Tom and Bontiea Goss made some payments to him indirectly in order to conceal on the charity's books and records the full amount he was paid;

- Tom and Bontiea Goss and Marilyn Nolan caused the charity to pay him as a

"consultant" in order to conceal the nature of his services for the Charity, which were advocacy and lobbying; and,

- Jones's compensation for work done on behalf of a separate for-profit company owned in part by Tom and Bontiea Goss should have been paid by that company, and not the Charity.

## III.    SENTENCING CALCULATION

### A.    Statutory Maximum Sentence.

#### 17-CR-00479 (Group 1)

The maximum statutory sentence the Court may impose on the defendant for a violation of 18 U.S.C. § 1001 is five years imprisonment, a three year period of supervised release, $250,000 fine and a $100.00 special assessment.

#### 19-CR-0462 (Group 2)

The maximum penalty for a violation of 18 U.S.C. § 371 is five years imprisonment, a three year period of supervised release, $250,000 fine and a $100.00 special assessment.

### B.    Sentencing Guidelines Calculation.

#### 1.    The USSG Guideline Range

#### 17-CR-00479 (Group 1)

The defendant's advisory guideline range for Group 1 is calculated as follows. Pursuant to U.S.S.G. §2C1.8, the base offense level is 8. PSR ¶ 92. The value of the illegal transactions at issue was between $40,000 and $95,000, and therefore the offense level is increased by 6 levels pursuant to U.S.S.G. §§2C1.8(b)(1) and 2B1.1(b)(1)(D). PSR ¶ 93. His adjusted offense level is therefore 14.

#### 19-CR-0462 (Group 2)

The defendant's advisory guideline range for Group 2 is calculated as follows. Pursuant to U.S.S.G. §2B1.1(a)(2), the base offense level is 6. PSR ¶ 98. The value of the illegal

transactions at issue was between $550,000 and $1,500,000, and therefore the offense level is

increased by 14 levels pursuant to U.S.S.G. §2B1.8(b)(1)(H). PSR ¶ 99. The offense involved

the misrepresentation that the defendant was acting on behalf of a charitable, educational,

religious, or political organization or government agency and is therefore increased by 2 levels

pursuant to U.S.S.G. §2B1.1(b)(9)(A). PSR ¶ 100. His adjusted offense level is therefore 22.

PSR ¶ 104.

### Combined Adjusted Offense Level

The greater of the adjusted offense levels is 22, and 1 level is added to reflect that there

are multiple units of conviction. PSR ¶ 107. Jones' combined adjusted offense level is therefore

23 pursuant to U.S.S.G. §3D1.4.

He is entitled to a 3 level downward adjustment for acceptance of responsibility and

assisting the government in the investigation or prosecution of his own conduct. PSR ¶¶ 110,

111.

His total offense level is therefore 20 and his criminal history category is I, resulting in an

advisory guideline range of 33 to 41 months.

## IV.    18 U.S.C. § 3553(a) FACTORS

The Supreme Court has declared: "As a matter of administration and to secure

nationwide consistency, the Guidelines should be the starting point and the initial benchmark."

*Gall v. United States*, 552 U.S. 38, 49 (2007). "These requirements mean that '[i]n the usual

sentencing, . . . the judge will use the Guidelines range as the starting point in the analysis and

impose a sentence within the range." *Peugh v. United States*, 133 S. Ct. 2072, 2083 (2013)

(quoting Freeman v. United States, 131 S. Ct. 2685, 2692 (2011) (plurality opinion); ellipsis in

original). "Common sense indicates that in general, this system will steer district courts to more

within-Guidelines sentences." *Peugh*, 133 S. Ct. at 2084. "The federal system adopts procedural measures intended to make the Guidelines the lodestone of sentencing." *Id*.

This Court must also consider all of the sentencing considerations set forth in Section 3553(a). Those factors include: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (3) the need to afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant; (4) the need to provide the defendant with educational or vocational training, medical care, or other correctional treatment in the most effective manner; (5) the guidelines and policy statements issued by the Sentencing Commission; (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims of the offense. 18 U.S.C. § 3553(a).[2]

A.    **The Nature and Circumstances of the Offense.**

Jones' participation in multiple campaign finance schemes struck serious blows to the core goals of the federal campaign finance laws: (1) fairness in elections conducted within universal limits (2) free of corrupt dealings. It is these harms that Congress sought to prevent when it imposed contribution limits and reporting requirements. The sentence imposed should reflect the seriousness of the violations, and counter the public cynicism that arises when insiders like Jones behave as though the rules do not apply or will not be enforced. The voting public

---

[2] Further, the "parsimony provision" of Section 3553(a) states that "[t]he court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection." The Third Circuit has held that "district judges are not required by the parsimony provision to routinely state that the sentence imposed is the minimum sentence necessary to achieve the purposes set forth in § 3553(a)(2). . . . '[W]e do not think that the "not greater than necessary" language requires as a general matter that a judge, having explained why a sentence has been chosen, also explain why some lighter sentence is inadequate.'" *United States v. Dragon*, 471 F.3d 501, 506 (3d Cir. 2006) (*quoting United States v. Navedo Concepcion*, 450 F.3d 54, 58 (1st Cir. 2006)).

needs to know that the electoral process belongs to them, and not cynical and deliberately subversive political operatives or candidates.

In Jones's case, however, his criminality did not end with corrupting the electoral process. For more than six years, this sophisticated political operative was paid by a tax-exempt public charity to provide advocacy services, including direct contact with legislators and government officials in order to influence those officials regarding issues impacting the Charity. Jones knew or should have known that the Charity executives concealed his lobbying efforts from the IRS, other state and federal agencies, and the public, because they were diverting funds—most of which came from federal and state agencies, to help line their own pockets, and those of Jones. This warrants incarceration.

**B.    The need for the sentence imposed to reflect the seriousness of the offenses, to promote respect for the law, and to provide just punishment for the offenses.**

While recognizing Jones' cooperation, this Court should impose a sentence that also reflects the seriousness of the multiple criminal violations. Corruption of the electoral process and violation of the campaign contribution limits cannot be tolerated. The crimes committed here by an experienced political operative were blatant violations of the campaign contribution laws. The misappropriation of charitable and grant funds is inexcusable. While our recommendation is tempered to reflect Jones' acceptance of responsibility and valuable cooperation, Jones' conduct merits a punishment in proportion to the seriousness of his crimes.

**C.    The need to afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant.**

The sentence imposed should deter others from embarking upon similar paths. The general public also needs to know that convictions for corrupting the campaign finance process and stealing charitable funds will be adequately punished.

**D. The guidelines and policy statements issued by the Sentencing Commission and the need to provide the defendant with educational or vocational training, medical care, or other correctional treatment in the most effective manner.**

We are aware of no training needs for Jones. We see no guideline policy statements that call for a downward variance here based upon needs for educational or vocational training.

**E. The need to avoid unwarranted sentence disparities.**

The most equitable way to avoid disparity and ensure that the defendant's sentence is arrived at by a fair and objective consideration is to calculate the advisory sentencing guideline range, and then apply a reduction in the advisory range warranted by Jones' substantial cooperation.

While the sentencing guidelines are advisory, they remain the sole means available for assuring some measure of uniformity in sentencing, fulfilling a key Congressional goal in adopting the Sentencing Reform Act of 1984. Referring to the guidelines while carefully considering the 3553(a) factors particularly relevant to an individual defendant is the only available means of preventing the disfavored result of basing sentences on the luck of the draw in judicial assignments. The Third Circuit explained:

> Even under the current advisory system, district courts must "meaningfully consider" § 3553(a)(4), i.e., "the applicable category of offense . . . as set forth in the guidelines." The section of *Booker* that makes the Guidelines advisory explains that "the remaining system, while not the system Congress enacted, nonetheless continue[s] to move sentencing in Congress' preferred direction, *helping to avoid excessive sentencing disparities while maintaining flexibility sufficient to individualize sentences where necessary.*" *Booker*, 543 U.S. at 264-65 (emphasis added). The Guidelines remain at the center of this effort to "avoid excessive sentencing disparities," and, as the *Booker* Court explained, the Sentencing Commission will continue "to promote uniformity in the sentencing process through the Guidelines. *Id.* at 263. We have likewise observed that the "'Guidelines remain an essential tool in creating a fair and uniform sentencing regime across the country.'" *Cooper*, 437 F.3d at 331 (quoting *United States v. Mykytiuk*, 415 F.3d 606, 608 (7th Cir. 2005)).*United States v. Ricks*, 494 F.3d 394, 400 (3d Cir. 2007) (emphasis in original).

## V.   <u>FORFEITURE</u>

### 19-CR-0462 (Group 2)

The defendant has agreed to the entry of a forfeiture money judgement, based on the

following facts set forth on p. 21 of the WDMO plea agreement reproduced below:

B.      Defendant's Admission of the Forfeiture Allegation

83)     The defendant admits and acknowledges that he received a total of $973,807.28 from Alternative Opportunities, Inc. and Preferred Family Healthcare, Inc., both directly and indirectly.

84)      The defendant admits and acknowledges he willfully blinded himself to (in other words, deliberately avoided learning or recognizing) the following facts, which should have been obvious to him:  (a) Person #1, Person #2, Person #3 and Person #4 made some payments to him indirectly in order to conceal on the Charity's books and records the full amount he was paid; (b) Person #1, Person #2, and Person #3 caused the Charity to pay him as a "consultant" in order to conceal the nature of his services for the Charity, which were advocacy and lobbying; and (c) that his compensation for work done on behalf of Entity E, which was Person #1's and Person #2's for-profit company, should have been paid by Entity E, and not the Charity.

85)      The defendant further admits and acknowledges that he kicked back to Person #4 $219,000 of the amount he received by way of this scheme, and at Person  #4's direction paid over an additional $45,000 of that amount to Person #7.

86)     In admitting the Forfeiture Allegation of the Information, the defendant acknowledges he understands a money judgment will be entered against him in an as-yet unspecified amount, based on the facts set forth above.

Based on the defendant having received a total of $973,807.28 in connection with the

offense for which he was convicted, that is, conspiracy to commit Federal Program Theft, in

violation of Title 18, United States Code, Section 371, the Court should enter a forfeiture order

in that amount, as a money judgment.[3]

---

[3]  Pursuant to his negotiations with the WDMO, Jones consented to a preliminary order of forfeiture based on the facts set forth as the factual basis for his plea, but reserved the right to contest the ultimate amount to be forfeited. The government anticipates that Jones will argue that he is entitled to some sort of "credit" for the kickbacks he paid

Under 18 U.S.C. § 981(a)(1)(C), the defendant is required to forfeit "[a]ny property, real or personal, which constitutes or is derived from proceeds traceable to" his violation of 18 U.S.C. §§ 371 and 666. Section 981 defines "proceeds," breaking the definition into two parts: (1) In cases "involving illegal goods, illegal services, unlawful activities, and telemarketing and health care fraud schemes, the term 'proceeds' means property of any kind obtained directly or indirectly, as a result of the commission of the offense giving rise to forfeiture, . . ., and is not limited to the net gain or profit realized from the offense," 18 U.S.C. § 981(a)(2)(A); and (2) in cases "involving lawful goods or lawful series that are sold or provided in an illegal manner, the term 'proceeds' means the amount of money acquired through the illegal transactions resulting in the forfeiture, less the direct costs incurred in providing the goods and services." *Id.* 18 U.S.C. § 981(a)(2)(B).

Embezzlement and theft cannot be conducted legally and are therefore illegal services and unlawful activities under Section 981. *See United States v. George*, 886 F.3d 31, 40 (1st Cir. 2018) ("embezzlement 'cannot be done lawfully, and therefore is properly considered an 'unlawful activity' within the meaning of section 981(a)(2)(A)'"); *United States v. Bodouva*, 853 F.3d 76, 80 (2nd Cir. 2017) (same); *United States v. Torre*s, 703 F.3d 194, 197 (6th Cir. 2012) (defendant convicted of theft of government property under § 641 to forfeit gross proceeds under § 981(a)(2)(A)); *United States v. Tartaglione*, 2018 WL 1740532, *23 fn. 29 (E.D. Pa. April 11, 2018) (defendant convicted of conspiracy, mail fraud, and theft from program receiving federal funds to forfeit gross proceeds under § 981(a)(2)(A)). Under this definition, the defendant is required to forfeit the gross proceeds of his offense. Such proceeds include any property, real or

---

to his co-conspirators, and that consequently the forfeiture amount should be reduced by $264,000. The government is unaware of any legal authority justifying a reduction or "credit" to Jones in the forfeiture amount based upon illegal payments he made to his co-conspirators from the criminal proceeds that he received from the Charity.

personal, tangible or intangible, that the defendant would not have obtained or retained, but for the crime. *United States v. Ofchinick*, 883 F.2d 1172, 1183 (3d Cir. 1989).

In this case, the defendant received $973,807.28 in gross proceeds. Any "costs" that the defendant may have incurred related to the kickbacks are not deductible. Thus, the amount of forfeiture should not be reduced by the amount of the kickbacks since such deduction is not authorized under the forfeiture statute.

## VI.    RESTITUTION

### 19-CR-0462 (Group 2)

After extensive internal review, and coordination with the various agencies that provided funds to Preferred Family Healthcare, Inc., and Alternative Opportunities, Inc. (collectively the "Charity"), it is the United States' position that no restitution should be ordered as to Jones. In the first place, the government notes that the Charity, acting through its executives and employees, and with the knowledge and/or willful blindness of multiple members of its board of directors, misapplied many millions of dollars of its funds – most of which the United States had provided through grants, contracts, and Medicaid reimbursement. The loss associated with the Charity's payments to defendant Jones was a part of this embezzlement and misapplication. On these facts, the statutory victim was not the Charity, which as an organization was responsible for the diversion of the funds. Rather, the victims were either the federal agencies providing funds to the Charity through a variety of grants, contracts, and other programs (many of which did not involve any direct fraud), or the other non-profit organizations that would have received the grants, program funds, etc., but for the embezzlement and misapplication. Considering the alternative possibilities:

(1.)    If government agencies are considered the victims, since the fraud is not

attributable to specific programs, attempting to apportion the loss amongst them is virtually impossible. Further, in most cases the agencies do not have a mechanism to accept restitution not tied to a specific program loss. Consequently, determining and directing restitution would unnecessarily prolong sentencing under 18 U.S.C. § 3663A(c)(3)(B); and

        (2.)    If other nonprofits, as potential grant recipients, are considered the victims, it cannot be determined with any certainty which ones might have been awarded the grants, contracts, etc., so the actual victims are impossible to determine under 18 U.S.C. § 3663A(a)(2).

In any event, the forfeiture money judgment, which the defendant has acknowledged is the amount he received from the scheme, is an adequate monetary penalty because it returns to the U.S. Treasury the full amount the defendant received in connection with the offense.

## V.    **CONCLUSION**

Criminal campaign finance schemes are an assault upon our democratic and electoral processes, and therefore warrant serious penalties. Similarly, conspiring to commit Federal Program Theft and receiving $973,807.28 in connection with the theft merits a serious sentence. We recognize Jones' substantial assistance, and believe that he should be rewarded for his timely cooperation with a downward departure from the 33 to 41 months' incarceration called for under the sentencing guidelines. However, corruption of the electoral process and theft and misuse of grant funds destroys the public's trust in government, and must be punished. Accordingly, a period of incarceration is warranted.

Respectfully submitted,

WILLIAM M. MCSWAIN
United States Attorney

COREY R. AMUNDSON
Chief, Public Integrity Section
Criminal Division
U.S. Department of Justice


*s/ Richard Barrett*
RICHARD BARRET
Assistant United States Attorney
Chief, Corruption and Tax


*s/  Eric L. Gibson*
ERIC L. GIBSON
Assistant United States Attorney


*s/  Richard Pilger*
RICHARD PILGER
Director, Election Crimes Branch
REBECCA SCHUMAN
Trial Attorney
Public Integrity Section
Criminal Division
U.S. Department of Justice

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the Government's Sentencing Memorandum has been served by electronic means upon Jeffrey Miller, Esq., counsel for defendant Jimmie Moore.


*s/ Eric L. Gibson*
_____
Eric L. Gibson
Assistant United States Attorney

Dated: December 12, 2019