# UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | | |
|---|---|---|---|
| UNITED STATES OF AMERICA | : | | |
| v. | : | CRIMINAL NOS. | 19-00462 |
| | | | 17-00563 |
| DONALD A. JONES | : | | |

## ORDER

AND NOW, this       day of _____, 2022, upon consideration of the defendant's

motion for early termination of his term of supervised release, the government's response to the

motion, and the relevant sentencing factors of 18 U.S.C. § 3553(a), it is hereby ORDERED  that

the defendant's motion is DENIED.

BY THE COURT:

_____

**THE HON. NITZA I. QUINONES ALEJANDRO**
*Judge, United States District Court*

# UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | | |
|---|---|---|---|
| UNITED STATES OF AMERICA | : | | |
| v. | : | CRIMINAL NOS. | 17-00563 |
| | | | 19-00462 |
| DONALD A. JONES | : | | |

## GOVERNMENT'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION FOR EARLY TERMINATION OF SUPERVISED RELEASE

Defendant Donald "D.A." Jones seeks termination of supervised release, even though he has completed only approximately 14 months of a 36-month period imposed by the sentencing court. Engaging in criminal campaign finance schemes and receiving $973,807 in connection with federal program theft warranted serious penalties, of which supervised release was a significant part. Jones' substantial assistance was recognized at his sentencing, and he was already rewarded for his timely cooperation with a downward departure from the 33 to 41 months' incarceration called for under the sentencing guidelines. The full term of supervised release imposed by the Court is required to achieve the goals of sentencing, and therefore, Jones' sentence should not be altered.

## I.      Procedural Background.

On October 24, 2017, a federal grand jury sitting in the Eastern District of Pennsylvania (EDPA) returned an indictment charging Jones with violating federal campaign finance laws in connection with a 2012 congressional primary campaign for the United States House of Representatives. On December 4, 2017, defendant Jones executed a written plea agreement with the United States Attorney's Office for the EDPA in *United States v Donald "D.A." Jones*, 17-00563-JD. In his plea agreement, the parties expressly contemplated that another matter from the Western District of Missouri (WDMO) would be transferred to the EDPA for sentencing

pursuant to Rule 20 of the Federal Rules of Criminal Procedure.  On December 8, 2017, defendant Jones entered a plea of guilty to Count Six of the indictment charging him with making false statements in violation of 18 U.S.C. § 1001(a)(2).  *See United States v Donald "D.A." Jones*, 17-00563-JD, Dkt. No. 25.

On December 18, 2017, an information was filed in the United States District Court for the WDMO charging defendant Jones with conspiracy against the United States in violation of 18 U.S.C. § 371, that is, conspiracy to steal from an organization receiving federal funds.  The same day, defendant Jones executed a written plea agreement with the United States Attorney's Office for the WDMO, and subsequently entered a guilty plea.  The Rule 20 Transfer was received in this district on or about August 12, 2019.

II.     **Factual Background.**

**17-CR-00563**

The defendant, Donald "D.A." Jones, participated in two schemes in two consecutive

election cycles in two separate campaigns for the United States House of Representatives, to

willfully circumvent federal campaign finance limits, and to defeat transparency and obstruct

justice in the campaign finance process as administered by the Federal Election Commission

("FEC").  On December 8, 2017, defendant Jones pleaded guilty to Count Six of the Indictment[1]

charging him with false statements in a matter within the jurisdiction of the executive branch, in

violation of 18 U.S.C. § 1001(a)(2), arising from his participation in a scheme hatched by

Kenneth Smukler[2] involving payments from the Bob Brady for Congress campaign to the

congressional campaign of Jimmie Moore that were made for the purpose of removing Moore as

a candidate from the 2012 Democratic race for Pennsylvania's First Congressional District.[3]

**Bob Brady for Congress Scheme**

In the 2012 Democratic primary election for Pennsylvania's First Congressional District,

Jimmie Moore, a former Philadelphia Municipal Court Judge, ran against the incumbent, Robert

Brady.  As the evidence at Smukler's trial proved, Moore struck a deal by which he agreed to

---

[1] On October 24, 2017, the Grand Jury returned a five-count indictment charging Jones and co-defendant Kenneth Smukler with Title 18 offenses, including conspiracy and a scheme to falsify, and also multiple violations of Title 52's Federal Election Campaign Act ("FECA") regarding the 2012 congressional primary campaign of then United States Representative Robert Brady. On March 20, 2018, the Grand Jury returned a superseding indictment charging Smukler with another six counts, including another Title 18 falsification scheme and obstruction of justice and additional criminal violations of FECA in connection with the 2014 congressional primary campaign of Marjorie Margolies, a former Member of the United States House of Representatives.  Jones pled guilty aagreed to cooperate against Smukler.
[2] Smukler was a lawyer and an experienced, high-priced, 30-year veteran of political campaigns involving some of the most powerful politicians in the Philadelphia region
[3] In defendant's plea agreement with the Eastern District of Pennsylvania, the government agreed not to oppose Jones' request for concurrent terms.

withdraw from the race in exchange for funds from the Bob Brady for Congress campaign (the "Brady Campaign") to be used to pay off Moore's campaign debts.  Those debts included money that Jimmie Moore for Congress (the "Moore campaign") owed to several vendors, to Moore himself, and to Carolyn Cavaness, who was Moore's campaign manager.  Jones' political consulting company was used as a pass through to funnel the last payment from the Brady campaign to Moore's agent.  During the investigation, Jones lied to the FBI about his role and knowledge of the scheme.

### The Marjorie 2014 Scheme

Jones also participated in another scheme concocted by Smukler involving additional campaign finance offenses in connection with a different campaign:  the 2014 congressional primary campaign of Marjorie Margolies.  Smukler funneled three unlawful contributions to the campaign—a $78,750 contribution largely funded by his brother and two contributions totaling $150,000 funded by his friend—through his political consulting companies.  Smukler also made two straw contributions to the campaign using his own money—a $23,750 contribution through the candidate and a $2,600 contribution through defendant Jones.  In addition, Smukler caused the Margolies campaign to make false statements to the Federal Election Commission to disguise these unlawful contributions:  three false statements on campaign finance reports and a false statement in a letter to the FEC written by a lawyer for the campaign in response to a complaint filed by one of Margolies's opponents.

### 19-CR-0462

On December 18, 2017, in the Western District of Missouri, defendant Jones pled guilty to an Information, charging him with conspiracy in violation of 18 U.S.C. § 371, that is, conspiracy to steal from an organization receiving federal funds.  Jones also agreed to forfeit to

the United States the property described in the Forfeiture Allegation of the Information.

In that case, Jones's firm, D.A. Jones & Associates, based in Philadelphia, provided political and advocacy services, including consulting, analysis, and public relations.  Jones admitted that he was paid approximately $973,807 by Preferred Family Healthcare, Inc., formerly known as Alternative Opportunities, Inc. ("the Charity"), a non-profit charity in Springfield, Missouri, for illegal lobbying and political activity on behalf of the Charity.  Two co-conspirators received a total of $264,000 in kickbacks from Jones.

Executives at the Charity were involved in the offenses including Tom Goss, Bontiea Goss, and Marilyn Nolan – all residents of Springfield, Missouri.  Co-conspirator Milton R. Cranford, a resident of Rogers, Ark., served as an executive for Charity operations in the state of Arkansas.  Cranford also operated two lobbying firms.  An Arkansas lobbyist and former state legislator named Eddie Cooper was also complicit.  Cooper was also a board member and employee of the Charity.

The Charity and its subsidiaries provide a variety of services to individuals, including mental and behavioral health treatment and counseling, substance abuse treatment and counseling, employment assistance, aid to individuals with developmental disabilities, and medical services. The Charity received Medicaid reimbursements from the states of Missouri, Arkansas, Kansas and Oklahoma from 2011 to 2016, of which the federal portion totaled more than $255 million. The Charity also received more than $53 million from the federal government (the Departments of Health and Human Services, Labor, Agriculture, Housing and Urban Development, Veterans Affairs, and Justice) under programs involving grants, contracts, loans, guarantees, insurance and other forms of federal assistance from July 1, 2010, to June 30, 2016.

The conspirators, including Jones, engaged in multiple schemes to unlawfully use the

Charity's funds to make political contributions and for excessive and unreported lobbying and political advocacy.  In order to provide a veneer of legitimacy for the kickbacks paid to themselves and others, and to disguise the nature and source of the payments, conspirators caused the payments to be described in the records as business expenses, such as "consulting" and "training" services, and executed sham "consulting agreements."

The conspirators caused the charity to engage in political outreach that violated both law and public policy. For example, they employed lobbyists and advocates (including Jones) to influence elected and appointed public officials, which the Charity did not properly report to the IRS on its annual returns.  Also, the conspirators caused personal contributions to elected officials and their political campaigns to be reimbursed by the Charity. Such indirect contributions are prohibited by law just as if the payments had been made by the Charity directly.

Jones admitted that he worked from 2011 through January 2017 to provide advocacy services, including direct contact with legislators and government officials, in order to influence elected and appointed public officials regarding legislative issues that impacted the Charity. Jones also solicited the assistance of elected and appointed officials in steering grants and other sources of funding to the Charity.

The charity paid Jones a total of $973,807, with some payments routed through different business entities or lobbying firms. Although his services were falsely described as "consulting" services and the payments made to Jones as payments pursuant to a "consulting agreement," they actually were payments for Jones's advocacy services, including direct contact with elected and appointed public officials.

Jones admitted that he paid $219,000 in kickbacks to Cranford and that he made two

payments totaling $45,000 to Cooper.  Both Cranford and Cooper worked for the Charity.

Jones has admitted to willfully blinding himself to (in other words, deliberately avoided learning or recognizing) the following facts, which should have been obvious to him:

- Tom and Bontiea Goss made some payments to him indirectly in order to conceal on the charity's books and records the full amount he was paid;

- Tom and Bontiea Goss and Marilyn Nolan caused the charity to pay him as a "consultant" in order to conceal the nature of his services for the Charity, which were advocacy and lobbying; and,

- Jones's compensation for work done on behalf of  a separate for-profit company owned in part by Tom and Bontiea Goss should have been paid by that company, and not the Charity.

## III.    Sentencing Calculation

### A.    Statutory Maximum Sentence.

#### 17-CR-00563 (Group 1)

The maximum statutory sentence the Court could have imposed on the defendant for a violation of 18 U.S.C. § 1001 was five years' imprisonment, a three-year period of supervised release, $250,000 fine and a $100.00 special assessment.

#### 19-CR-0462 (Group 2)

The maximum statutory sentence the Court could have imposed on the defendant  for a violation of 18 U.S.C. § 371 was five years' imprisonment, a three-year period of supervised release, $250,000 fine and a $100.00 special assessment.

### B.    Sentencing Guidelines Calculation.

#### 1.    The USSG Guideline Range

#### 17-CR-00563 (Group 1)

The defendant's advisory guideline range for Group 1 was calculated as follows. Pursuant to U.S.S.G. §2C1.8, the base offense level was 8.  PSR ¶ 92.  The value of the illegal

transactions at issue was between $40,000 and $95,000, and therefore the offense level was increased by 6 levels pursuant to U.S.S.G. §§2C1.8(b)(1) and 2B1.1(b)(1)(D). PSR ¶ 93. His adjusted offense level was therefore 14.

## 19-CR-0462 (Group 2)

The defendant's advisory guideline range for Group 2 was calculated as follows. Pursuant to U.S.S.G. §2B1.1(a)(2), the base offense level was 6. PSR ¶ 98. The value of the illegal transactions at issue was between $550,000 and $1,500,000, and therefore the offense level was increased by 14 levels pursuant to U.S.S.G. §2B1.8(b)(1)(H). PSR ¶ 99. The offense involved the misrepresentation that the defendant was acting on behalf of a charitable, educational, religious, or political organization or government agency and was therefore increased by 2 levels pursuant to U.S.S.G. §2B1.1(b)(9)(A). PSR ¶ 100. His adjusted offense level was therefore 22. PSR ¶ 104.

## Combined Adjusted Offense Level

The greater of the adjusted offense levels was 22, and 1 level was added to reflect that there were multiple units of conviction. PSR ¶ 107. Jones' combined adjusted offense level was therefore 23 pursuant to U.S.S.G. §3D1.4.

He received a three-level downward adjustment for acceptance of responsibility and assisting the government in the investigation or prosecution of his own conduct. PSR ¶¶ 110, 111.

His total offense level was therefore 20 and his criminal history category was I, resulting in an advisory guideline range of **33 to 41 months**.

On or about December 20, 2019, the Honorable Jan E. DuBois of the Eastern District of Pennsylvania sentenced Jones to one year and one day on Count Six of the indictment in

Criminal No. 17-563 to be served with a concurrent term of one year and one day on Count One of the information in Criminal No. 19-462, to be followed by two concurrent three-year terms of supervised release.  This sentence was nearly one-third of the recommended guideline range.

Regarding Criminal No. 19-462, after extensive internal review, and in coordination with the various agencies that provided funds to Preferred Family Healthcare, Inc., and Alternative Opportunities, Inc. (collectively the "Charity"), the United States took the position that restitution should not be ordered as to Jones.  In the first place, the government noted that the Charity, acting through its executives and employees, and with the knowledge and/or willful blindness of multiple members of its board of directors, misapplied many millions of dollars of its funds – most of which the United States had provided through grants, contracts, and Medicaid reimbursement.  The loss associated with the Charity's payments to defendant Jones was a part of this embezzlement and misapplication.  On these facts, the statutory victim was not the Charity, which as an organization was responsible for the diversion of the funds.  Rather, the victims were either the federal agencies providing funds to the Charity through a variety of grants, contracts, and other programs (many of which did not involve any direct fraud), or the other non-profit organizations that would have received the grants, program funds, etc., but for the embezzlement and misapplication.  Considering the alternative possibilities:

(1.)    If government agencies were considered the victims, since the fraud was not attributable to specific programs, attempting to apportion the loss amongst them was virtually impossible.  Further, in most cases the agencies did not have a mechanism to accept restitution

not tied to a specific program loss. Consequently, determining and directing restitution would have unnecessarily prolonged sentencing under 18 U.S.C. § 3663A(c)(3)(B); and

(2.)     If other nonprofits, as potential grant recipients, were considered the victims, it could not be determined with any certainty which ones might have been awarded the grants, contracts, etc., so the actual victims were impossible to determine under 18 U.S.C. § 3663A(a)(2).

Therefore, the government sought a forfeiture money judgment based on the amount the defendant acknowledged he received from the scheme, as an adequate monetary penalty because it would have returned to the U.S. Treasury the full amount the defendant received in connection with the offense. However, the Court declined to order forfeiture.

Defendant Jones never even completed his one year and one day sentence and was released early to home confinement during the COVID-19 pandemic.

## IV.   Discussion.

The defendant does not set forth an adequate basis for alteration of the Court's sentence. The applicable statute, 18 U.S.C. § 3583(e), provides district courts with authority to grant early termination of supervised release if, in the discretion of the Court, such relief is appropriate and in the interests of justice. That section provides that:

> [t]he court may, after considering the factors set forth in Section 3553(a)(1), (a)(2)(B), (a)(2)(C), (a)(2)(D), (a)(4), (a)(5), (a)(6), and (a)(7) – (1) terminate a term of supervised release and discharge the defendant released at any time after the expiration of one year of supervised release, pursuant to the provisions of the Federal Rules of Criminal Procedure relating to the modification of probation, if it is satisfied that such action is warranted by the conduct of the defendant released and the interest of justice.

18 U.S.C. § 3583(e).

It is the defendant's burden, "as the party receiving the benefit of early termination, to demonstrate that such a course of action is justified." *United States v. Weber*, 451 F.3d 552, 559

n.9 (9th Cir. 2006).  It "logically follows that the burden of ultimate persuasion should rest upon the party attempting to adjust the sentence."  *United States v. McDowell*, 888 F.2d 285, 291 (3d Cir. 1989).  In assessing whether the defendant has met that burden, this Court must consider:

(1) the nature and circumstances of the offense and the defendant's history and characteristics, 18 U.S.C. § 3553(a)(1);

(2) the need to afford adequate deterrence to criminal conduct, protect the public from further crimes of the defendant, and provide him with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner, § 3553(a)(2)(B)-(D);

(3) the kinds of sentence and sentencing range established for the defendant's crimes, § 3553(a)(4)(A);

(4) pertinent policy statements issued by the United States Sentencing Commission, § 3553(a)(5);

(5) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct, § 3553(a)(6); and

(6) the need to provide restitution to any victims of the offense, § 3553(a)(7).

"After considering these factors, the court may provide relief only if it is satisfied that early termination is warranted by the defendant's conduct and is in the interest of justice."  *United States v. Melvin*, 978 F.3d 49, 52 (3d Cir. 2020).  "The expansive phrases 'conduct of the defendant' and 'interest of justice' make clear that a district court enjoys discretion to consider a wide range of circumstances when determining whether to grant early termination."  *Id.* (quotation marks omitted).  Furthermore, "[d]istrict courts are not required to make specific findings of fact with respect to each of these" specified § 3553(a) "factors; rather, a statement that [the district court] has considered the statutory factors is sufficient."  *Id.* at 52-53 (citation omitted).

The Court "need not find that an exceptional, extraordinary, new, or unforeseen circumstance warrants early termination of a term of supervised release before granting a motion under 18 U.S.C. § 3583(e)(1)." *Melvin*, 978 F.3d at 53. However, the Third Circuit stated:

> We think that *[g]enerally*, early termination of supervised release under § 3583(e)(1) will be proper only when the sentencing judge is satisfied that new or unforeseen circumstances warrant it. . . . That is because, if a sentence was "sufficient, but not greater than necessary" when first pronounced, 18 U.S.C. § 3553(a), we would expect that something will have changed in the interim that would justify an early end to a term of supervised release. But we disavow any suggestion that new or unforeseen circumstances must be shown.

*Id.* (citation and quotation marks omitted, emphasis in original).

Here, there has been no change in circumstances, and accordingly termination of supervised release is not advised. The defendant's compliance with the terms of supervised release is merely what is expected. *See, e.g.*, *United States v. Guilliatt,* 2005 WL 589354, *1 (E.D. Pa. 2005) ("The conduct cited by defendant in support of his Petition is commendable. However, it is nothing more than what is required under the terms of defendant's probation."). If simple compliance with the terms of the court's supervision were sufficient to justify early termination, "the exception would swallow the rule." *Id. See also United States v. Lohman*, 2007 WL 1430282, *1 (E.D. Wis. 2007) (holding that if simple compliance were sufficient for early termination, "every defendant who avoided revocation would be eligible for early termination").

It bears emphasis that the term of supervised release is an important component of the defendant's sentence. In *Gall v. United States*, 552 U.S. 38, 48 (2007), the Supreme Court explained at length that a term of supervised release is no trifling matter; it is a form of punishment that involves restrictions on liberty. For this reason, habitual post-sentencing alteration of a term of supervised release would defeat the goals of transparency and truth in

sentencing that animated the Sentencing Reform Act of 1984, which implemented determinate federal sentencing while also creating the provisions for supervised release.  Such a result would, in part, offend the expectations of victims of crime, who heard the sentence imposed only to learn later that the offender does not have to serve the full term.

In seeking early termination, the defendant asserts that he has behaved appropriately while on supervised release, but as noted, that is what the law expects.  Moreover, supervision remains necessary to achieve the goals of sentencing, including punishment, general and specific deterrence, protecting the public, and promoting respect for the law.

Jones' participation in multiple campaign finance schemes struck serious blows to the core goals of the federal campaign finance laws:  (1) fairness in elections conducted within universal limits (2) free of corrupt dealings.  It is these harms that Congress sought to prevent when it imposed contribution limits and reporting requirements.  The sentence imposed should reflect the seriousness of the violations, and counter the public cynicism that arises when insiders like Jones behave as though the rules do not apply to him or will not be enforced.  The voting public needs to know that the electoral process belongs to them, and not cynical and deliberately subversive political operatives or candidates.

In Jones's case, however, his criminality did not end with corrupting the electoral process.  For more than six years, this sophisticated political operative was paid by a tax-exempt public charity to provide advocacy services, including direct contact with legislators and government officials in order to influence those officials regarding issues impacting the Charity. Jones knew or should have known that the Charity executives concealed his lobbying efforts from the IRS, other state and federal agencies, and the public, because they were diverting

funds—most of which came from federal and state agencies, to help line their own pockets, and those of Jones.  This warranted punishment.

It is certainly hoped that the penalties imposed on Jones, including the short term of imprisonment he served, are accomplishing the purposes of sentencing and leading to Jones' rehabilitation and reform. But given his history, it is certainly reasonable to maintain supervision to assure that this is the case.  Jones has also failed to demonstrate any undue harm he faces from the criminal sentence.  He asserts that his employment prospects are affected due to his restricted ability to travel and attend meetings.  But the circumstances he describes are matters routinely addressed and accommodated by probation officers, and do not provide any basis for removing all supervision entirely.

In these circumstances, supervision by the Probation Office for a three-year period to assure rehabilitation and compliance with the law is fully appropriate. That is what this Court decided when it imposed sentence, and there is no reason to reconsider that judgment now.

## V.    Conclusion.

For the foregoing reasons, the Court should deny the defendant's motion.


Respectfully yours,

JENNIFER ARBITTIER WILLIAMS
United States Attorney


*/s Eric L. Gibson*
ERIC L. GIBSON
Assistant United States Attorney
Deputy Chief, Corruption and Civil Rights Unit

**CERTIFICATE OF SERVICE**

I hereby certify that a copy of this response in opposition has been served to the below

counsel of record via ECF.

Richard H. Maurer
Attorney at Law
FLAMM WALTON HEIMBACH
Commerce Center, Suite 410
5050 W. Tilghman Street
Allentown, PA  18104

*/s Eric L. Gibson*
ERIC L. GIBSON
Assistant United States Attorney
Deputy Chief, Corruption and Civil Rights Unit

Dated:  March 1, 2022.